# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CASEY DUNNAM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:24-cv-00231** |
| | ) | |
| **WILSON COUNTY, TENNESSEE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This case arises from Casey Dunnam's ("Dunnam") termination from the Wilson County Probation Department after he filed an anonymous complaint about Betsky Jakalski's timekeeping practices. Dunnam brings 42 U.S.C. § 1983 ("§ 1983") First Amendment, Public Employee Political Freedom Act ("PEPFA"), Tenn. Code. Ann. § 8-50-601, <u>et seq.</u>, and Tennessee Public Protection Act ("TPPA") § 50-1-304, <u>et seq.</u> retaliation claims against Wilson County, Tennessee ("Wilson County" or "County") and Betsky Jakalski, in her individual capacity ("Jakalski").

Before the Court are various motions: (1) Jakalski's Motion for Summary Judgment (Doc. No. 23); (2) Wilson County's Motion for Summary Judgment (Doc. No. 27); (3) Wilson County's Motion to Amend/Correct Statement of Facts (Doc. No. 33); (4) Dunnam's Motion to Amend/Correct Response (Doc. No. 58); and (5) Dunnam's Motion for Leave to File Sur-Reply (Doc. No. 64). All motions are ripe for review. For the following reasons, the Court concludes that: Wilson County's Motion for Summary Judgment (Doc. No. 27) be granted in part and denied in part; Wilson County's Motion to Amend/Correct Statement of Facts (Doc. No. 33), Dunnam's Motion to Amend/Correct Response (Doc. No. 58), and Dunnam's Motion for Leave to File Sur-

Reply (Doc. No. 64) be granted; and Jakalski's Motion for Summary Judgment (Doc. No. 23) be denied.[1]

## I. BACKGROUND AND UNDISPUTED FACTS[2]

The County hired Jakalski to be the Director of the Wilson County Probation Department in 2014. (Doc. No. 53 ¶ 1). As Director, she has the authority to hire and fire probation officers. (Doc. No. 50 ¶ 3).

Dunnam began working as an at-will probation officer in the Wilson County Probation Office ("Probation Office") in 2015. (Id. ¶ 3; Doc. No. 50 ¶¶ 1–2). He worked under Jakalski and Officer Supervisor Rebekah Cothran ("Cothran"). (Doc. No. 50 ¶ 1; Doc. No. 53 ¶¶ 4–5; Doc.

---

[1] Dunnam responded to Wilson County's original statement of undisputed material facts (Doc. No. 28) that Wilson County seeks to replace. Dunnam does not oppose Wilson County's request. Wilson County's replacement statement of undisputed material facts only omits privileged work product, the Court finds it appropriate to grant Wilson County's Motion (Doc. No. 33) and will consider Dunnam's response (Doc. No. 50) as responding to Wilson County's amended statement of material facts mirrored therein. The same is true of Dunnam's Motion to Substitute—the changes Dunnam seeks to correct are minimal. Wilson County and Jakalski do not oppose the Motion (Doc. No. 58 at 1). So, it will be granted, and the Court will construe Wilson County's and Jakalski's replies as related to that filing. Further, the Court will grant Dunnam's Motion for Leave to File Sur-Reply (Doc. No. 64) given that Wilson County raised new arguments and evidence in its reply.

[2] The undisputed facts in this section are drawn from the undisputed portions of the parties' statements of facts (Doc. Nos. 50, 53), the exhibits and depositions submitted in connection with the summary judgment briefing, and portions of the Complaint (Doc. No. 1) that are not contradicted by the evidence in the record. While the Court has no duty to "sift through the record in search of evidence to support" the parties' respective positions, Parsons v. FedEx Corp., 360 F. App'x 652, 646 (6th Cir. 2010), it will consider the full scope of the record in making its ruling on the parties' various pending Motions. Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). To the extent Dunnam has failed to comply with the Court's Local Rules in responding the Defendants' statements of undisputed material facts, the Court notes as much and considers such facts unopposed where appropriate. M.D. Tenn. L.R. 56.01(e) (describing what is appropriate to include in a response to the movant's statement of facts); see Weil v. Neary, 278 U.S. 160, 169 (1929) (local rules have the "force of law").

No. 51-1 at 17:4–8). Dunnam's employment at the Probation Office is governed, in part, by the

Wilson County Employee Handbook ("Handbook"). As relevant here, the Handbook provides:

[Rule] 1.8: EXPECTATIONS and RULES OF CONDUCT

The following are expectations, rules, and standards that are designed to aid each employee in effectively performing his job duties and establishing a positive working environment. Rules and standards are necessary to protect the health and safety of all employees to maintain uninterrupted service, and to protect the County's goodwill and property. Employees who violate any County rule or regulation may be disciplined through corrective action up to and including termination from employment for the first offense.

The following list includes items which are deemed sufficient cause for corrective action, but is not intended and does not constitute all items which are subject to corrective action:

- Conduct that could cause embarrassment or criticism to Wilson County whether on or off duty.
- Conflicts of interest and the appearance of conflicts that would diminish the level of integrity of Wilson County Government in the eyes of the public, accepting gratuities or favors that a reasonable person may interpret as an attempt to influence employee's actions.
- Engagement in other employment or conducting private business while on duty or off duty in a manner or extent that affects your service to Wilson County.
- Unauthorized possession or destruction of County property, or of the property of a fellow employee.
- Unauthorized disclosure of confidential information.
- Deliberate, careless and unauthorized use of County supplies, vehicles, funds, or equipment.
- Failure to maintain courteous, satisfactory, and harmonious working relationships with the public and fellow employees.
- Visiting, loitering, loafing, lounging, or sleeping during scheduled working hours.
- Disobedience or insubordination, failure to follow departmental rules and regulations.
- Conviction of a criminal charge.
- Destroying, altering, concealing, removing. or making false entry of governmental records or official documents
- Excessive absenteeism, tardiness, or leaving one's work area without supervisor's knowledge or permission.
- Inadequate or unsatisfactory job performance to include quality and quantity of work.

3

[Rule] 7.3: ACCEPTABLE USAGE POLICY (Email, Computer and Internet)

**Use and Prohibitions:** County employees, vendors/business partners/subrecipients, local governments, and other governmental agencies may be authorized to access County network resources to perform business functions with or on behalf of the County. Users must be acting within the scope of their employment or contractual relationship with the County and must agree to abide by the terms of this agreement as evidenced by his/her signature. It is recognized that there may be incidental personal use of County Network Resources. This practice is not encouraged, and employees should be aware that all usage may be monitored that there is no right to privacy. Various transactions resulting from network usage are the property of the County and are thus subject to open records laws.

**Prohibitions:**
- Sending or sharing with unauthorized persons any information that is confidential by law, rule or regulation.
- Installing software that has not been authorized by the IT Department.
- Attaching processing devices that have not been authorized by the IT Department.
- Using network resources to play or download games, music or videos that are not in support of business functions.
- Leaving workstation unattended without engaging password protection for the keyboard or workstation.
- Utilizing unauthorized peer-to-peer networking or peer-to-peer file sharing.
- Using network resources in support of unlawful activities as defined by federal, County, and local law.
- Utilizing network resources for activities that violate conduct policies established by the Human Resources department or department where the user is employed or under contract.

(Doc. No. 51-9 at 16–17, 78–79).

Eventually, Dunnam began to suspect that Jakalski was stealing County time by logging work hours that she did not actually work. (Doc. No. 50 ¶ 7). To address this, in May 2017, Dunnam began keeping track of Jakalski's absences from work. (Id.). He stopped tracking Jakaliski's whereabouts in June 2017, but resumed doing so again five years later, in June 2022. (Id. ¶¶ 7, 9, 12; see Doc. No. 51-13). Dunnam also obtained access to Jakaliski's time sheets.

4

(See Doc. No. 50 ¶ 14). Dunnam did not inform Jakalski he was tracking her time or whereabouts during these periods.[3] (Id. ¶ 8).

In the summer of 2023, Dunnam reported to the Director of Wilson County Human Resources, Qiana Scruggs ("Scruggs"), that he believed Jakalski was stealing County time. (Doc. No. 50 ¶ 38; Doc. No. 53 ¶ 7). Scruggs gave Dunnam a form to complete to submit a complaint on the matter. (Doc. No. 53 ¶ 8). Several weeks later, on July 10, 2023, Dunnam submitted a workplace complaint against Jakalski, which stated in part:

> WHAT IS THE BASIS FOR YOUR COMPLAINT? (I.E., ABUSIVE CONDUCT IN THE WORKPLACE, DISCRIMINATION, HARRASSMENT, RETALIATION, WORKPLACE VIOLENCE, ETC.)
>
> Theft, stealing time
>
> EXPLAIN AS CLEARLY AS POSSIBLE WHAT HAPPENED, INCLUDING WHO DID WHAT, WHERE IT OCCURRED, WHO WAS INVOLVED, ETC. PLEASE ATTACH ADDITIONAL PAGES IF NECESSARY.
>
> Betsy Jakalski takes time off work with-out using sick or annual Leave. Please see Attached List of time that has been taken on certain days. There is a gap from June of 2017 to June of 2022 because I didn't think my word would matter. But, there was time solen in those years also.
>
> EXPLAIN WHY YOU BELIEVE THESE EVENTS OCCURRED.
>
> I have seen her come in late and take days off and not put it on her timesheet. I have worked there 2 months less and she has taken a lot more time than I have but has hundreds more hours accrued than I have.

---

[3] The parties dispute whether Jakalski's timekeeping practices were consistent with Handbook and County policies. During the period Dunnam tracked Jakaliski's time, Jakalski qualified as an exempt employee of the County. (Doc. No. 50 ¶ 16). As an exempt employee, County practice allowed Jakalski to record 40 hours a week on timesheets unless she took sick or vacation days, regardless of the precise hours worked. (Id. ¶ 17). According to Jakalski, she followed that timekeeping practice, consistent with prior instruction to do so. (Id. ¶ 18; Doc. No. 53 ¶ 24).

(Doc. No. 27-9 at 2–3).  Dunnam's complaint also included an attachment showing a list of the dates and times she reported on her timesheet hours, which was work he believed was inconsistent with the hours he saw her in the Probation Office.  (Doc. No. 50 ¶¶ 8–9; Doc. No. 50 ¶ 40).  Dunnam requested that the complaint be filed anonymously, never spoke to any elected official about his complaint, and did not disclose it to any other County employee.  (Doc. No. 50 ¶¶ 41, 49–50).

Scruggs investigated Dunnam's complaint.  (Doc. No. 50 ¶ 42; Doc. No. 53 ¶ 19).  In doing so, she compared Jakalski's submitted time sheets and her time entry data in Wilson County's online time entry system, Skyward, to at least a subset of Dunnam's provided list of purported time discrepancies.  (Doc. No. 50 ¶ 42).  After conducting this review, Scruggs prepared a summary of her investigation, concluding that only seven full days of the many reported days of stealing time were not consistent with the Skyward data.  (Doc. No. 53 ¶ 21; see Doc. No. 51-17 (investigative file stating "[a]fter looking in Skyward and paper timesheets and comparing against the attachment = 7 full days off not reported in Skyward or paper timesheets")).  Scruggs further determined Dunnam's list of Jakalski's timekeeping violations was unreliable because the Skyward data disproved the alleged discrepancies.  (Doc. No. 51-17).  She then reported her results to Mayor Hutto.  (Doc. No. 52 ¶ 22).

On August 18, 2023, Scruggs, Mayor Hutto and Jakalski met to discuss the allegations of time theft brought against her.  (Doc. No. 50 ¶ 46).  Mayor Hutto informed Jakalski that she needed to start tracking her time at work more precisely.  (Id. ¶ 35).  During the discussion, neither Mayor Hutto, nor Scruggs, revealed Dunnam's identity to Jakalski or showed her the anonymous complaint against her.  (Id. ¶ 46; Doc. No. 53 ¶ 34).  Rather, they suggested that it may have been a private citizen who made the anonymous complaint.  (Doc. No. 53 ¶ 36).  No further interviews

6

were conducted regarding Dunnam's complaint.  (Id. ¶ 47).  After Scruggs's review of Jakalski's records and her subsequent interview of Jakalski, she determined Dunnam's complaint was unsubstantiated and closed the investigation.  (Doc. No. 50 ¶ 48; Doc. No. 51-17).

In Fall 2023, the Probation Office hired Jazmyn Kincaid ("Kincaid") as a part-time employee.  (Doc. No. 50 ¶ 52).  On September 28, 2023, Jakalski instructed Probation Officer Doug Grooms ("Grooms") to use Dunnam's computer for Kincaid's training.  (Id. ¶ 53; Doc. No. 53 ¶ 38).  This was a common practice due to its location at the front of the Probation Office.  (Id.).  While doing this, Grooms found at Dunnam's workstation and on Dunnam's computer a hidden web camera pointed at Jakalski's desk; two videos showing Jakalski's desk; Jakalski's timesheets and work phone bills; a court-ordered mental health assessment of a Wilson County Judge; and numerous personal documents belonging to Dunnam.  (Doc. No. 50 ¶ 54; Doc. No. 53 ¶¶ 41–44).  Grooms mentioned these items to Jakalski, prompting her to search Dunnam's computer and workspace herself.  (Doc. No. 50 ¶ 56).

Jakalski believed that Dunnam secretly recorded her desk, possessed unauthorized documents, and retained excessive personal files on his work computer.[4]  (Id. ¶ 58).  Based on this, she became concerned that Dunnam had violated Handbook Rules 1.8 and 7.3.  (Id.).  To address this, Jakalski called Scruggs to discuss what she had found on Dunnam's computer.  (Doc. No. 53 ¶ 47).  Scruggs agreed with Jakalski that Dunnam's actions may have violated portions of the Handbook, including Rule 7.3.  (Doc. No. 27-3 at 152:17–153:22).  Scruggs and Jakalski then met with Cothran, informing her that Jakalski found her timesheets and travel expenses on Dunnam's computer.  (Doc. No. 53 ¶¶ 53–54).  Given the circumstances, Jakalski and Scruggs thought it best

---

[4] At this point, Jakalski also began to suspect that Dunnam may have made the anonymous complaint about her timekeeping practices.  (See Doc. No. 58-2 at 216:7–25).

to meet with Dunnam to get his side of the story regarding the items on his computer. (Id. ¶¶ 48, 57).

Dunnam arrived at work on Friday, September 29, 2023, to find that he was not able to log onto his computer. (Id. ¶ 50). He asked Jakalski why he could not log on. (Id.). Jakalski responded by informing Dunnam that she was waiting on Human Resources to have a meeting with him about items found on his computer. (Id. ¶ 51). Dunnam, Jakalski, Scruggs, and Cothran then met to discuss the items found on Dunnam's computer. (Id. ¶ 58; Doc. No. 50 ¶ 61). Jakalski spoke to Dunnam about her time sheets, expense sheets, Dunnam's personal items, and another employee's "half sheets" being found on Dunnam's computer. (Doc. No. 53 ¶ 60). After the meeting, Jakalski put Dunnam on paid administrative leave for the rest of the day and the following day. (Doc. No. 50 ¶ 63). She instructed Dunnam to return to work on the following Monday. (Id.).

Jakalski again consulted with Scruggs and Cothran about how to handle Dunnam having various personnel and personal items on his computer. (Doc. No. 50 ¶ 65; Doc. No. 53 ¶¶ 69, 73). Scruggs confirmed that termination was a permissible response, but felt progressive discipline for Dunnam was more appropriate given the lack of evidence that Dunnam deliberately put the documents on his work computer. (Doc. No. 50 ¶ 65; Doc. No. 53 ¶ 69). Cothran, on the other hand, felt Dunnam should be terminated. (Doc. No. 50 ¶ 66; Doc. No. 53 ¶ 70). Ultimately, Jakalski agreed with Cothran. (Doc. No. 50 ¶ 67). After speaking with Jakalski, Cothran advised Dunnam by text that he would be placed on paid administrative leave through the following Tuesday of the next work week. (Doc. No. 53 ¶ 73). Jakalski later asked Dunnam to come to work the next day, a Monday, at 7:30 a.m. (Id. ¶ 81).

When Dunnam showed up for work on Monday, he had not yet been informed of his termination. (Doc. No. 50 ¶ 70). Dunnam met with Jakalski, and she explained to Dunnam that he violated Rule 1.8 because (1) his conduct caused embarrassment; (2) he was working other jobs; (3) he had improper confidential information; (4) he failed to maintain harmonious working relationships; and (5) he was insubordinate for having an official's records on his computer. (Id. ¶ 85). She further explained that Dunnam violated Rule 7.3 through accessing the network for second jobs and personal business. (Id. ¶ 86). Jakalski then handed Dunnam a Letter of Separation and gave him a choice to resign. (Doc. No. 50 ¶ 82). The Letter of Separation stated the following:

> Casey Dunnam,
>
> This letter is to inform you that your employment with Wilson County Probation Services will end as of October 3, 2023.
>
> You have been terminated based on the following:
>
> Page 15 of the employee handbook 1.6 Employment At Will
>
> Page 16 & 17 of the employee handbook 1.8 Expectations and Rules of Conduct
>
> Page 78 of the employee handbook 7.3 Acceptable Usage Policy (Email, Computer, and Internet)
>
> If you have any questions concerning your compensation or benefits, please contact Wilson County Human Resources at 615-466-5138.
>
> Sincerely,
> Betsy Jakalski, Director

(Doc. No. 24-13 at 1). Dunnam rejected the offer of resignation (see id.), and was terminated. (Doc. No. 50 ¶ 71; Doc. No. 53 ¶ 106).

## II.    LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A

genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted).  "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (citation and quotations omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" Miller v. Maddox, 866 F.3d 386, 389 (6th Cir. 2017) (quoting Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).  The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  See Anderson, 477 U.S. at 249.  The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party.  See Rodgers, 344 F.3d at 595.

### III.    ANALYSIS

Wilson County and Jakalski assert they are entitled to summary judgment on each of the four claims Dunnam raises.  (See Doc. No. 1).  The Court starts with the central focus of the parties' briefing: Dunnam's First Amendment retaliation claims brought under § 1983.  Section

10

1983 "provides for the vindication of federal rights." Green v. Throckmorton, 681 F.3d 853, 859–60 (6th Cir. 2012). To survive summary judgment in a § 1983 action, Dunnam must demonstrate a genuine issue of material fact "'that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States.'" Id. (quoting Waters v. City of Morristown, Tenn., 242 F.3d 353, 358–59 (6th Cir. 2001)); Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583 (6th Cir. 2012). Dunnam asserts without dispute that Wilson County and Jakalski—clearly "person[s] acting under color of state law"—violated his constitutional rights to free speech. (See Doc. Nos. 45, 49 (not challenging this prong)). The Court therefore need only focus on the second portion of Dunnam's § 1983 claims, whether Wilson County and Jakalski deprived Dunnam of rights secured by the Constitution. Waters, 242 F.3d at 358–59. After addressing these arguments, the Court will turn to the parties' disputes on Dunnam's PEPFA and TPPA claims against Wilson County.

### A. Count 2: Section 1983 First Amendment Retaliation Claim Against Jakalski

The Court starts with Jakalski's argument that she is entitled to qualified immunity on Dunnam's § 1983 First Amendment retaliation claim. "Qualified immunity, if it applies, is a defense not just against liability, but against suit itself." Johnson v. Moseley, 790 F.3d 649, 653 (6th Cir. 2015) (citation omitted). Because Jakalski has raised the defense, it is Dunnam's burden of showing she is not entitled to it. Reilly v. Vadlamudi, 680 F.3d 617, 623 (6th Cir. 2012). In doing so, Dunnam must satisfy both steps of the qualified immunity inquiry, that: (1) Jakalski violated a "constitutional right" of Dunnam's and (2) the constitutional right was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001); Crawford v. Tilley, 15 F.4th 752, 762 (6th Cir. 2021). Jakalski asserts Dunnam cannot satisfy either prong.

11

1.  Whether Jakalski Violated Dunnam's First Amendment Rights

The Court turns to the first prong of the qualified immunity analysis, whether Dunnam has sufficiently established that Jakalski violated one of his constitutional rights.  See Reilly, 680 F.3d at 623; Johnson, 790 F.3d at 653.  The basis of Dunnam's First Amendment retaliation claim is that Jakalski retaliated against him by suspending and terminating his employment with the Probation Office after he reported Jakalski's alleged time theft.  (Doc. No. 1 ¶¶ 71–83).

For Dunnam, a public employee, "[t]o establish a *prima facie* case of First Amendment retaliation, [he] must show that (1) he engaged in constitutionally protected speech or conduct; (2) the employer took an adverse action against him that would deter an ordinary person from engaging in that conduct; and (3) the protected speech was a substantial or motivating factor in the adverse action."  Laster v. City of Kalamazoo, 746 F.3d 714, 733 (6th Cir. 2014) (citing Scarbrough v. Morgan Cnty. Bd. of Educ., 470 F.3d 250, 255 (6th Cir. 2006) and Farhat v. Jopke, 370 F.3d 580, 588 (6th Cir. 2004)).  "If the plaintiff makes this showing, the burden shifts to the defendant to prove the harmlessness of the retaliation: that, even if Jarnigan had an impermissible motive, he would have taken the same adverse action against Wolfe 'in the absence of the protected conduct.'"  Wolfe v. Jarnigan, 357 F. App'x 621, 622 (6th Cir. 2009) (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant."  Eckerman v. Tenn. Dep't of Safety, 636 F.3d 202, 208 (6th Cir. 2010).  Importantly, "[u]nlike in the McDonnel Douglas burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims."  Dye v. Office of the Racing Com'n, 702 F.3d 286, 295 (6th Cir. 2012).

12

Jakalski challenges Dunnam's showing on the first and third elements of his First Amendment retaliation claim, appropriately conceding that she took an adverse action against Dunnam (i.e., suspending and terminating his employment). She also contends she is entitled to the Mt. Healthy defense because there is no dispute of fact that the retaliation was harmless. Each issue will be addressed in turn.

    a.   Whether Dunnam Engaged in Constitutionally Protected Speech

"Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people[.]'" Lane v. Franks, 573 U.S. 228, 235–36 (2014) (quoting Roth v. United States, 354 U.S. 476, 484 (1957)). Notably, "[t]his remains true when speech concerns information related to or learned through public employment." Id. at 236. Still, this right is tempered by "the government's countervailing interest in controlling the operation of its workplaces." Id. To balance the various interests at play, courts engage in a two-step inquiry to determine whether this element is satisfied. Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois, 391 U.S. 563, 568 (1968). In Garcetti v. Ceballos, the Supreme Court instructed this process is as follows:

> The first [inquiry] requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The [second] question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public[, or whether the employee made a false statement that was knowing or recklessly made]. This consideration reflects the importance of the relationship between the speaker's expressions and employment.

547 U.S. 410, 418 (2006) (citations omitted). Jakalski challenges the existence of evidence establishing both prongs of the inquiry.

i.  Whether Dunnam Spoke as a Citizen on a Matter of Public Concern

The Court starts by evaluating the speech at issue. This inquiry is a question of law. Handy-Clay v. City of Memphis, Tenn., 695 F.3d 531, 543 (6th Cir. 2012). In evaluating this, "[a] court should examine the 'content, form, and context of a given statement, as revealed by the whole record.'" Burgess v. Paducah Area Transit Auth., 387 F. App'x 538, 544 (6th Cir. 2010) (quoting Connick v. Myers, 461 U.S. 138, 147–48 (1983)). "While motive for the speech is a relevant factor, . . . 'the pertinent question is not *why* the employee spoke, but *what* he said.'" Westmoreland v. Sutherland, 662 F.3d 714, 719 (6th Cir. 2011) (quoting Farhat, 370 F.3d at 591). "That means [w]e examine the *point* of the speech in question." Myers v. City of Centerville, Ohio, 41 F.4th 746, 760 (6th Cir. 2022) (citations and quotations omitted). The Court must also ask "whether that point concerned the public." Id. "[A] public concern is one relating to 'any matter of political, social, or other concern to the community.'" Burgess, 387 F. App'x at 544 (quoting Connick, 461 U.S. at 146). "Put differently, speech concerns such matters 'when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" Myers, 41 F.4th at 760 (quoting Lane, 573 U.S. at 241).

Applying those rules to the facts here, the Court finds that Dunnam's speech undoubtedly involved a matter of public concern. Notably, the Sixth Circuit has "consistently reiterated that allegations of public corruption 'are exactly the type of statements that demand strong First Amendment protections.'" Mayhew v. Town of Smyrna, Tennessee, 856 F.3d 456, 468 (6th Cir. 2017) (quoting Handy-Clay, 695 F.3d at 543–44 (collecting cases)). "So too are statements '[e]xposing governmental inefficiency and misconduct[.]'" Myers, 41 F.4th at 760–61 (quoting Garcetti, 547 U.S. at 425). By contrast, where the speech is based on "the quintessential employee beef: [that] management has acted incompetently[,]" Barnes v. McDowell, 848 F.2d 725, 735 (6th

14

Cir. 1988), such "internal personnel disputes" do not typically "involve matters of public concern." Myers, 41 F.4th at 761 (citing Brandenburg v. Hous. Auth. of Irvine, 253 F.3d 891, 898 (6th Cir. 2001)).  Even still, "if speech addresses an internal personnel dispute, it may involve a matter of public concern if the dispute arose from 'actual or potential wrongdoing or any breach of the public trust.'"  Id. (quoting Brandenburg, 253 F.3d at 898).  This inquiry is a question of law.  Handy-Clay, 695 F.3d at 543.

Here, the Court has little trouble concluding, and Jakalski does not meaningfully dispute, that Dunnam spoke out about Jakalski's timekeeping.  This is a matter of public concern.  In determining the "point" of his complaint, "based mainly on its content, not [Dunnam's] motives for writing it[,]" that much is clear.  Myers, 41 F.4th at 761 (citing Rodgers v. Banks, 344 F.3d 587, 600 (6th Cir. 2003).  Dunnam's complaint reports that its basis is "theft, stealing time" and that:

> Betsy Jakalski takes time off work with-out using sick or annual leave.  Please see [the] Attached List of time that has been taken on certain days.  There is a gap from June of 2017 to June of 2022 because I didn't think my word would matter.  But, there was time solen in those years also.

(Doc. No. 27-9).  Simply put, the complaint voiced Dunnam's concern that Jakalski was wrongly being paid for time that she had not performed work for the Probation Office.  As such, she was stealing public money that is a matter of public concern, as it raises possible government employee inefficiency or misconduct that is "of considerable significance" to the public.  Garcetti, 547 U.S. at 425.

The Court easily disposes of Jakalski's arguments to the contrary. For example, Jakalski's contention that Dunnam actually reported her because of her personal relationship with another employee, not because he was concerned about public corruption, is inappropriate given that the Court must look "not [at] the motivation for speaking but at the content of the speech."  Handy-

15

Clay, 695 F.3d at 543–44. Nor is Dunnam's anonymous speech dispositive, given that "[c]onstitutional protection for speech on matters of public concern is not premised on the communication of that speech to the public." Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1, 131 F.3d 564, 579 (6th Cir. 1997). Jakalski's cited authority does not instruct otherwise. See, e.g. Burgess, 387 F. App'x at 544 (finding speech was a matter of private concern where the content showed the speakers were worried primarily about office management). Because, in viewing the record in the light most favorable to Dunnam, the content, form, and context of his speech shows that he was raising a concern that the Director of the Probation Office was improperly collecting payments she did not earn. He has satisfied his burden of showing he was speaking on a matter of public concern in making his report to HR.

The Court next considers whether Dunnam spoke as a citizen when filing his report about Jakalski's timekeeping. "Employee speech made on a matter of public concern is still unprotected if it was 'made pursuant to [an employee's] official responsibilities.'" Ashford v. Univ. of Michigan, 89 F.4th 960, 972 (6th Cir. 2024) (quoting Garcetti, 547 U.S. at 424). Whether speech falls within a public employee's official duties "does not turn solely on whether the speech contained information they obtained as a result of their employment, but depends primarily on whether the speech is ordinarily within the scope of an employee's duties." Id. (citations and quotations omitted). To determine whether speech was made due to an employee's duties, courts look to factors such as "the speech's 'impetus,' setting, audience, and general subject matter." Id. (citing Weisbarth v. Geauga Park Dist., 499 F.3d 538, 546 (6th Cir. 2007)). These questions ultimately require courts to "consider the duties that the employee actually performs on a day-to-day basis." DeCrane v. Eckart, 12 F.4th 586, 596 (6th Cir. 2021). "When considering these questions in the course of resolving an employer's summary-judgment motion, we take any

16

disputed historical facts in the light most favorable to the employee." Id. "After doing so, however, we treat the ultimate question whether the employee spoke as a government agent or private citizen as a legal one to be decided without deference to the factfinder." Id.

Dunnam was hired by the Probation Office as a probation officer. He raised the issue of Jakalski's timekeeping with Scruggs during work hours.[5] (See Doc. No. 58-4 at 83:1–85:20). Because "[o]n-the-clock speech at the employer's place of business is more likely to be speech as a government agent[,]" this factor weighs in favor of finding Dunnam spoke as a public employee, rather than a citizen. DeCrane, 12 F.4th at 596. However, the audience for the speech cuts the other way. Dunnam reported his concerns to Scruggs, a HR employee outside of Dunnam's direct chain of command. (Doc. No. 51-1 at 17:4–8 (Dunnam testifying that he worked under Cothran and Jakalski)). That Dunnam reported "outside [his] chain of command" makes it "less likely to be within [] his ordinary job responsibilities." Ashford, 89 F.4th at 972.

Considering the impetus of Dunnam's speech is the same, it also favors action outside of his job duties. True, Dunnam testified during his deposition that he "felt like he had an obligation [] to report the theft" and that reporting time theft was "probably" in his job description, (Doc. No. 57-1 at 46:18–20, 46:24–47:3), but this is not dispositive, The evidence in the record is that Dunnam's job duties, and daily job requirements, did not require as much. DeCrane, 12 F.4th at 596. Absent from Dunnam's job descriptions is any requirement that he report suspicions of time theft. (Doc. No. 51-16). Rather, it instructs that Dunnam's primary job is to:

> [P]erform work associated with Probation and coordinating activities between the Court and people on court probation. Duties and responsibilities include supervising caseloads on probation to assure they follow probationary rules and court orders, monitoring progress during probation, meeting with probationer, preparing recommendations and referrals, preparing reports and maintaining

---

[5] It is not apparent from the current record before the Court whether Dunnam filed his anonymous complaint during work hours.

records, and providing information and assistance. Reports to Director of Probation.

(Id.). The result is the same when considering what Dunnam's daily work actually entailed, as there is evidence that it reflected his written job description. (See Doc. No. 51-4 ¶¶ 5–6); see also DeCrane, 12 F.4th at 596. Accordingly, the Court finds that the impetus of Dunnam's speech was not to fulfil a job duty, but rather to report an unrelated problem. See id. Considering all of this evidence together and in Dunnam's favor, the Court finds that Dunnam has sufficiently established that he spoke as a citizen on a matter of public concern.

ii.    Pickering Limitations

The Court turns to the next step in the First Amendment retaliation analysis: the two limitations from the Pickering doctrine that protects the right of public employees to comment on matters of public concern. "First, the [Pickering] Court declined to extend protection to false statements that are knowingly or recklessly made." Gossman v. Allen, 950 F.2d 338, 342 (6th Cir. 1991) (citing Pickering, 391 U.S. at 574). "Second, the employee's right to comment on matters of public concern must be balanced against the interest of the public employer in efficiently providing services to the public." Id. (citing Pickering, 391 U.S. at 568). Jakalski argues that both of these limitations on Dunnam's free speech rights apply in this instance.

First, Jakalski argues that Dunnam made his timekeeping complaints with knowledge of, or reckless indifference to, its falsity. "Since we are reviewing the record to see whether [Jakalski] ha[s] qualified immunity, [the Court] need not decide whether [Dunnam] knowingly or recklessly made false statements." Gossman, 950 F.3d at 342. "Instead, [the Court] need only decide whether a reasonable official could believe that [Dunnam] knowingly or recklessly made false statements." Id. Viewing the evidence in Dunnam's favor, he survives the first factor.

18

The Court acknowledges that Jakalski points to various pieces of evidence showing that the allegations against her may well have been false, in that Jakalski has work obligations that require her to be out of the office. (See Doc. No. 25 at 18–19). However, this evidence is not conclusive. Jakalski ignores that: Scruggs *did* find that at least some of Dunnam's allegations of time theft were supported. (See Doc. No. 51-17 (finding seven full days of reported work where Jakalski was unaccounted for)). Indeed, Jakalski admitted that work performed outside the office was infrequent (Doc. No. 58-2 at 76:22–25 (Jakalski stating that she would "pop into court" for a "[f]ew minutes at a time" a "couple times a week"), 78:14–23 (stating she goes to board meetings "once every couple of months), 82:20–85:11 (stating she goes to conferences a few times a year)); and that the Handbook provides that time worked should be recorded accurately (Doc. No. 51-9 at 28).[6] Considering this evidence in Dunnam's favor, no reasonable officer could have concluded that Dunnam made his timekeeping complaints with knowing, or reckless indifference to, their falsity.[7] Gossman, 950 F.3d at 342.

Jakalski further asserts that she, as the "relevant government entity" here, "had an adequate justification for treating" Dunnam differently from any other member of the public. Garcetti, 547 U.S. at 418 (citing Pickering, 391 U.S. at 568). This issue requires the Court to engage in the "balance between the interests of the [employee], as a citizen, in commenting upon matters of

---

[6] Defendant's arguments that Jakalski was exempt from this policy are not only not dispositive on the issue, but do little to speak to Dunnam's knowledge of, or reckless indifference to, as much. This is particularly so given the deposition testimony showing that if Jakalski was not accurately reporting her time that Mayor Hutto would have viewed that as violation of Wilson County policies. (See Doc. No. 58-5 at 80:3–9 (**Q**: "[I]f Ms. Jakalski had been inaccurately reporting her time and had been working less than 40 hours a week, would that be a violation of any Wilson County policy that you know of?" **A**: "Inaccuracy on the timesheets, yes, is a violation.")).

[7] Defendants' arguments opining on where Jakalski could have been, without more, do little to advance the purported falsity of Dunnam's speech. (See, e.g., Doc. No. 62 at 3 n.1 (providing a list, without citation, of where Jakalski "could have been" during alleged absences from the Probation Office)).

19

public concern and the interest of [Jakalski], as an employer, in promoting the efficiency of the public services [she] performs through [her] employees." Pickering, 391 U.S. at 568. "Considerations involved in this balancing test include 'whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" Dye, 702 F.3d at 295 (quoting Rankin v. McPherson, 483 U.S. 378, 388 (1987)).

Jakalski argues that there is no genuine dispute of material fact that she had adequate justification for treating Dunnam differently than other members of the public, given his actions caused negativity and distrust in the workplace. The Court need not do an in-depth evaluation of these arguments because, "as the Supreme Court has explained, in cases involving allegations of official misconduct and public corruption," such as Dunnam's allegations of Jakalski's time theft, "'the employer's side of the Pickering scale is entirely empty.'" Buddenberg v. Weisdack, 939 F.3d 732, 740 (6th Cir. 2019) (quoting Lane, 573 U.S. at 242). Given this, viewing the facts in Dunnam's favor, he has shown that Jakalski did not have an adequate justification to treat his speech on a matter of public concern as different from another member of the public's speech. Accordingly, Dunnam has established that the first element of his First Amendment retaliation claim is satisfied.

          b.   Whether Dunnam's Speech Was a Substantial or Motivating Factor in His Termination

This brings the Court to the parties' dispute of the third element of Dunnam's retaliation claim. "To satisfy the third prong of their First Amendment retaliation claim, plaintiffs must show that their terminations were motivated at least in part by the exercise of their free speech rights." Burgess, 387 F. App'x at 545 (citing Mount Healthy, 429 U.S. at 287). To do this, "[a]n employee

20

must establish a link between 'the speech in question [and] the defendant's decision to dismiss.'" Id. (quoting Bailey v. Floyd County Bd. of Educ., 106 F.3d 135, 145 (6th Cir. 1997)). This question of causation is typically "resolved by a jury, but a court may grant summary judgment on the issue of causation when there is no genuine issue of material fact from which a reasonable jury could conclude that the employee's discharge was motivated in part by her speech." Id. (citing Bailey, 106 F.3d at 145). Jakalski argues such circumstance is warranted here, given the evidence demonstrates Dunnam was suspended, and then terminated, because of his misconduct at work. (Doc. No. 25 at 19–21).

The Court is not convinced. True, on one hand Jakalski presents evidence that Dunnam (1) took timesheets and videos of a fellow employee; (2) had an excessive amount of personal and unauthorized items at his desk; and (3) broke trust in the workplace, all serving as the basis for his termination. That evidence is countered, however, by Dunnam's proffered evidence that: (1) the timing between Dunnam's speech and his termination is mere weeks apart; (2) Jakalski began to suspect, within days of Dunnam's termination, that he made the anonymous complaint about her timekeeping; and (3) none of the reasons given for Dunnam's termination actually constituted violations of the Handbook. (See Doc. No. 58-2 at 216:7–25 (Jakalski testifying that she suspected Dunnam may have filed the anonymous complaint after she searched his computer); see also, e.g., Doc. No. 57-1 at 106:21–107:11 (Dunnam testifying that he obtained timesheets properly because they would be downloaded to a shared drive from the scanner that he had access to on his computer)). Viewing these facts in Dunnam's favor, a reasonable jury could conclude that Jakalski terminated Dunnam in retaliation for Dunnam's anonymous complaint about her timekeeping. See Buddenberg, 939 F.3d at 741 (where plaintiff received notice of discipline four days after employer received notice of plaintiff's EEOC charge, "the rapid sequence of events . . . support[ed] an

21

inference that [the plaintiff's] protected speech caused her discipline"); <u>Dye</u>, 702 F.3d at 306 ("A lapse of two months . . . is sufficient to show a causal connection.").

   c. Whether Jakalski is Entitled to the Mt. Healthy Defense

  Finally, Jakalski argues she is entitled to the <u>Mt. Healthy</u> defense because she would have terminated Dunnam's employment "even in the absence of the protected conduct." <u>Mt. Healthy</u>, 429 U.S. at 287. Jakalski's arguments here, at bottom, are the same as those raised on the third prong of Dunnam's *prima facie* case establishing his First Amendment claim. The reasons they are not dispositive there ring true here as well. <u>See</u> <u>supra</u>, Section III.A.1.b. This is particularly true, given the various factual disputes on the propriety of Dunnam's conduct and that the <u>Mt. Healthy</u> defense "is a question of fact for the jury to decide." <u>Johnson v. Univ. of Cincinnati</u>, 215 F.3d 561, 584 (6th Cir. 2000). Accordingly, this matter is best presented to a jury for consideration.

   2. Whether Dunnam's Constitutional Right Was Clearly Established

  Because Dunnam has raised a genuine dispute of material fact on whether Jakalski violated his constitutionally protected rights, the Court turns to the next question in the qualified immunity analysis: whether Dunnam's First Amendment right was clearly established at the time Jakalski purportedly violated it.

  Jakalski may "be shielded from liability for civil damages if [her] actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" <u>Id.</u> at 739 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)). In determining whether a right is "sufficiently clear," the Court should not define them "at a high level of generality." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 742 (2011). This "usually means [Dunnam] must identify a case with

22

facts 'similar enough that' it 'squarely governs this one[.]'" Moore v. Oakland Cnty., Michigan, 126 F.4th 1163, 1167 (6th Cir. 2025) (quoting Lee v. Russ, 33 F.4th 860, 863 (6th Cir. 2022)) (quotations omitted). Still, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell [v. Forsyth], 472 U.S. 511, 535 n.12 (1985); but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640; see Harcz v. Boucher, 763 F. App'x 536, 542 (6th Cir. 2019) ("To violate a clearly established right, courts 'do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'") (quoting al-Kidd, 563 U.S. at 741). Ultimately, "'the salient question . . . is whether the state law' at the time of an incident provided 'fair warning' to the [officer] 'that [his] alleged [conduct] was unconstitutional.'" Tolan v. Cotton, 572 U.S. 650, 656 (2014) (quoting Hope, 536 U.S. at 739).

Even under this demanding standard, the Court must keep the procedural posture of the case in mind. Indeed, in deciding whether Jakalski is entitled to qualified immunity at this stage, the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." Tolan, 572 U.S. at 656. Instead, consistent with Rule 56, the Court "must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." Id. at 657 (citing Brosseau v. Haugen, 543 U.S. 194, 195, 198 (2009) (determining whether conduct violated clearly established law "'in light of the specific context of the case'" and construing "facts . . . in a light most favorable to" the nonmovant)).

While it is Dunnam's burden to point to relevant authority showing that his First Amendment rights were clearly established at the time of the instant events, Jakalski still must substantively address this issue to have summary judgment granted in her favor. Rather than doing

23

so, Jakalski rests her argument on the premise that "the undisputed material facts . . . [show] [Dunnam's] constitutional rights were not violated." (Doc. No. 25 at 24). Because this is no more than an incorrect skeletal argument, see supra, Section III.A.1, it is rejected.[8] See McPherson v. Kelsey, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (quoting Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n, 59 F.3d 284, 293–94 (1st Cir. 1995)). Accordingly, Jakalski's motion will be denied, and Dunnam's § 1983 claim against her will proceed to trial.[9]

B. Count 1: First Amendment Retaliation Claim Against Wilson County

The Court turns to Wilson County's challenge to Count 1, which alleges that Wilson County violated his First Amendment rights by retaliating against him after he reported Jakalski's time theft. (See Doc. No. 1 ¶¶ 59–70). Wilson County challenges Dunnam's First Amendment claim on both on substantive grounds and on the premise that Dunnam cannot establish municipal liability. Because Wilson County's arguments on the substance of Dunnam's First Amendment retaliation claim mirror Jakalski's failed arguments, the Court rejects Wilson County's on the same

---

[8] Dunnam is correct that he comes forth with relevant legal authority demonstrating that his First Amendment rights were clearly established when Jakalski suspended and fired him for his speech. (See Doc. No. 52 at 23 (citing Hoover v. Radabaugh, 123 F. Supp. 2d 412, 425 (S.D. Ohio 2000) (stating that Mt. Healthy demonstrates that First Amendment rights against retaliation have been clearly established for a long time)).

[9] To the extent Jakalski raises perfunctory additional arguments for summary judgment through incorporating Wilson County's brief into her own, the Court declines to address those issues, as they are made pursuant to a violation of the Court's preferences. See McPherson, 125 F.3d at 995–96; Judicial Preferences ¶ 9 ("Counsel should never incorporate legal authority or factual argument from another document, including a prior brief or the brief of another party in the case.").

bases.  See supra, Section III.A.1.  Accordingly, the Court need only address Wilson County's municipal liability arguments.

"A body politic is a 'person' within the meaning of § 1983."  Ford v. Cnty. of Grand Traverse, 535 F.3d 483, 495 (6th Cir. 2008) (citation omitted).  Still, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  Given this, "[t]o prevail in a § 1983 suit against a municipality," like the suit Dunnam brings against Wilson County here, "a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom."  Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005) (citing Monell, 436 U.S. at 694).

"There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom."  Thomas, 398. F.3d at 429.  "The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations."  Id. (citations omitted).  Here, Dunnam alleges the second and third: that Jakalski, an official with final decision-making authority, ratified unconstitutional retaliation; and that Wilson County had a policy of inadequately training officials like Jakalski "on the laws prohibiting retaliation."  (Doc. No. 1 ¶¶ 65, 68).  Wilson County moves for summary judgment on both theories of liability.  Because Dunnam has conceded he cannot establish his Monell claim against Wilson County based on its failure to properly train, the Court need only address whether Jakalski is an official with final decision-making authority whose decision to terminate Dunnam bound Wilson County.  See Humphrey v. United States Att'y Gen.'s Office, 279 F. App'x 328, 331 (6th Cir. 2008) (where plaintiff fails to respond to an argument in its response, any opposition is waived).

25

There are two requirements that must be satisfied for a decisionmaker's action to trigger municipal liability. First, the action taken must be from a decisionmaker with final decision-making authority on that issue. Thomas, 398. F.3d at 429. Second, the decisionmaker must "possess[] final authority to establish municipal policy with respect to the action ordered." Pembaur, 475 U.S. at 481; see id. at 482 ("The official must [] be responsible for establishing final government policy respecting such activity before the municipality can be held liable."). These requirements serve to ensure that "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Id. at 483.

Dunnam raises genuine disputes of material fact on these issues to survive summary judgment. On the first prong, Dunnam points to ample evidence that Jakalski was a final decisionmaker with respect to her ability to hire and fire employees at the Probation Office. For example, both her and Scruggs testified that Jakalski was the final decisionmaker on Dunnam's termination (Doc. No. 58-2 at 327:17–19; Doc. No. 58-4 at 153:24–154:3); and Jakalski made this choice despite there being other alternatives to termination (Doc. No. 58-4 at 151:19–152:1 (Scruggs recommending that Dunnam not be terminated, instead calling for some other disciplinary action)). See Pembaur, 475 U.S. at 483. Wilson County does not substantively dispute as much. (See Doc. No. 45 at 19 (focusing on the fact that it believes Jakalski did not have policymaking authority).

The same is true on the second prong—whether Jakalski had policymaking authority over the decision in question. As an initial matter, Wilson County's proffered evidence that Jakalski lacked the authority to set final policies, including those contained in the Employee Handbook that

26

governed the Probation Office, fails for lack of support for that proposition.[10] (Doc. No. 45 at 19 (citing to Doc. No. 27-11 at 6 (Handbook Introduction page) and Doc. No. 27-1 at 73:12–18 (Jakalski testifying about ensuring County policies are followed)). Indeed, Dunnam cites evidence showing that Jakalski *did* have policymaking authority over employment retention decisions. This is apparent in the Handbook's instruction that "[m]anagement is entitled to modify, revoke, or replace any policies and procedures at any time," (Doc. No. 51-9 at 15), and the Handbook's definition of management as "[a] person/elected official appointed to a position that either directs, manages and/or supervises a department and/or employee within that department" that could encompass Jakalski, based on her job description. (Id. at 10; Doc. No. 51-12 (stating the purpose of Jakalski's position is to "perform managerial/administrative work associated with overseeing operations of Probation")). That Jakalski has policymaking authority over hiring and firing decisions is also evident from prior policies instituted by Jakalski, parts of which instructed that employees that failed to abide by the policies could be "subject to disciplinary action[,]" in some instances including "termination[.]" (Doc. No. 51-14 at 4–5).

Viewing these facts together and in Dunnam's favor, a reasonable juror could conclude that Jakalski was a person with final decisionmaking and policymaking authority over hiring and firing decisions for the purposes of the Monell analysis. See Pembaur, 475 U.S. at 483; see also Lane v. City of Pickerington, 588 F. App'x 456, 468 (6th Cir. 2014) (holding summary judgment for the city was inappropriate where the official's conduct at issue, the city manager, "appear[ed] to have been the final decision maker when dealing with city employees"). Given this, Wilson County's motion will be rejected on Dunnam's First Amendment retaliation claim.

_____

[10] Wilson County also cites to a portion of Scruggs's testimony that is not included in the excerpts provided in support of its motion. (See Doc. No. 27-3 (omitting page 141 of Scruggs's transcript)).

C.  Count 4: TPPA Claim Against Wilson County

The Court next turns to Wilson County's challenge to Count 4, Dunnam's TPPA claim against Wilson County.  The TPPA prohibits an employee from being "discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities."  Tenn. Code Ann. § 50-1-304(b).  Dunnam alleges that Wilson County violated the TPPA by "suspend[ing] and terminat[ing] [Dunnam] because [Dunnam] complained about Ms. Jakalski's time theft[.]"  (Doc. No. 1 ¶ 88).  This claim is subject to the McDonnell Douglas burden shifting analysis.  See Tenn. Code Ann. § 50-1-304(f); McDonnell Douglas v. Green, 411 U.S. 792 (1973).

1.  Prima Facie Case

To demonstrate a *prima facie* case of retaliation under the TPPA, Dunnam must show "(1) his status as an employee of the defendant; (2) [his] refusal to participate in, or remain silent about, illegal activities; (3) his termination; and (4) an exclusive causal relationship between the refusal to participate in, or remain silent about, illegal activities and his termination."  Amos v. McNairy Cnty., 622 F. App'x 529, 536 (6th Cir. 2015).  As the Tennessee Supreme Court has instructed, Dunnam must "demonstrate that his whistleblowing behavior was the *sole* reason for his termination."  Guy v. Mut. of Omaha Ins. Co., 79 S.W.3d 528, 537 (Tenn. 2002).

The Court need only address the parties' dispute over the fourth element of Dunnam's TPPA claim, as it controls here.  Amos, 622 F. App'x at 536.  On this point, Dunnam relies on the same causation arguments here that he does for his First Amendment retaliation claim.  (Doc. No. 49 at 23).  That is in error, as the "sole cause" standard for causation for a TPPA claim is far greater than the "motivating cause" standard applied in the First Amendment context.  See Guy, 79 S.W.3d at 537; see also Mason v. Seaton, 942 S.W.2d 470, 473 (Tenn. 1997) ("proximity in time between the protected act and the discharge is not sufficient to establish a causal relationship" for a TPPA claim).  That heightened standard dooms Dunnam's TPPA claim, given the undisputed evidence

28

that Jakalski had the authority to fire Dunnam solely for his violations of the Handbook. For example, the record conclusively reflects that: (1) Dunnam had various personal items on his work computer, and (2) Dunnam "inadvertently" had a copy of the judge's medical form on his computer despite being instructed to delete it. (see Doc. No. 91 at 91:12–92:6 (Dunnam testifying that he was "sure" there were hundreds of personal items on his computer); Doc. No. 51-4 ¶ 11 (Dunnam admitting he kept a copy of the judge's medical form on his computer by mistake)). These issues are part of the justifications for Dunnam's ultimate termination. (See Doc. No. 24-13). Given that Dunnam cannot dispute that he committed some of the misconduct he was terminated for—even if he believes that conduct did not constitute sufficient reasons for his termination—he cannot meet the sole causation standard necessary for a TPPA claim. See Guy, 79 S.W.3d at 537; see also Levan v. Sears, Roebuck & Co., 984 F. Supp. 2d 855, 872 (E.D. Tenn. 2013) (granting summary judgment in employer's favor on TPPA claim where it was "undisputed that [the plaintiff] violated company policy, regardless of whether he did so knowingly"); Caruso v. St. Jude Children's Research Hosp., Inc., 215 F. Supp. 2d 930, 938 (W.D. Tenn. 2002) (granting summary judgment for employer on TPPA claim where it "established that there were reasons other than, or in addition to, [the plaintiff's] complaints for her discharge"). Accordingly, the Court will grant Wilson County's motion on Count 4.

D.  Count 3: PEPFA Claim Against Wilson County

The Court turns to Wilson County's final argument: that it is entitled to summary judgment on Count 3, Dunnam's PEPFA claim. Under PEPFA, a public employer, such as Wilson County, cannot "discipline, threaten to discipline or otherwise discriminate against an employee because such employee exercised that employee's right to communicate with an elected public official." Tenn. Code Ann. § 8-50-603(a). Dunnam alleges Wilson County did so by retaliating against him

for speaking with Scruggs, who relayed to Mayor Hutto, about his issues with Jakalski's timekeeping. (Doc. No. 1 ¶¶ 84–91).

"To establish a cause of action under PEPFA, the plaintiff must show (1) the plaintiff's status as an employee of the defendant; (2) that the plaintiff communicated with an elected official; (3) that the employer disciplined, threatened to discipline, or otherwise took an adverse action against the employee; and (4) that the communication with an elected public official was a substantial or motivating factor in the adverse action taken by the employer." Heriges v. Wilson Cnty., Tenn., 2010 WL 2507764, at *9 (M.D. Tenn. June 18, 2010) (citation omitted). Wilson County challenges the second and fourth elements of Dunnam's PEPFA claim. The fourth element mirrors the "substantial or motivating factor" analysis as used in the context of First Amendment retaliation claims. See id. (citation omitted). As such, the Court has already found a genuine dispute of fact on that issue, see supra, Section III.A.1.b, so it will focus its analysis on the second element of Dunnam's PEPFA claim.

On this issue, the parties agree that Dunnam communicated his timekeeping complaint to Scruggs—someone who is not an elected official. (See Doc. No. 50 ¶ 49 (Dunnam not disputing that he reported his complaint to Scruggs, who is not an elected official)). The parties dispute whether this is dispositive. Dunnam argues that it is not, given that courts have not yet ruled on whether the term "elected public official" includes agents. See Guthoerl v. City of Mount Juliet, 2006 WL 1454736, at *6 (M.D. Tenn. May 22, 2006). Wilson County counters that it is, noting that there is nothing in the record demonstrating that Dunnam directed his communication at a public official, directly or indirectly, nor is there evidence that Scruggs is an agent of Mayor Hutto's for the purposes of his PEPFA claim.

The Court, like the court in <u>Guthoerl</u>, need not answer the question of whether communicating with an elected official's agent satisfies the second element of a PEPFA claim. Even if Dunnam is correct on this point, he has not carried his burden here. True, Dunnam argues that "Scruggs qualifies as an agent" of Mayor Hutto because she worked for him and "relayed concerns within Wilson County straight to him." (Doc. No. 49 at 28). While that may be the case, Dunnam provides no citation to any evidence in the record. (<u>See</u> Doc. No. 50 ¶ 49 (relying on Doc. No. 51-6 at 96:18–97:25, Scruggs's deposition testimony, to show she is Mayor Hutto's agent, where Scruggs merely states that she told Mayor Hutto about the complaint)). This lack of evidentiary support for Dunnam's contention that Scruggs is Mayor Hutto's agent is further underscored by Wilson County's cited evidence that she is not. (<u>See, e.g.</u>, Doc. No. 62-3 at 15:21–25 (Mayor Hutto testifying that Scruggs reports to finance director), 51:7–15 (Mayor Hutto testifying that HR and finance departments handle timekeeping matters)). The cases Dunnam cites in support of his argument also fail. <u>See</u> <u>Guthoerl</u>, 2006 WL 1454736, at *6 (dismissing PEPFA claim because plaintiff could not show causation); <u>Atkins v. Town of Gibson</u>, 2016 WL 5859674, at *4 (W.D. Tenn. Oct. 6, 2016) (addressing the issue of whether a Facebook post constituted "communication" under the PEPFA). Given that Dunnam cannot establish that he communicated his concerns about Jakalski's timekeeping to Mayor Hutto—in any manner—summary judgment for Wilson County is warranted on this claim.

## IV.     CONCLUSION

For the foregoing reasons, the Court will rule as follows: Wilson County's Motion for Summary Judgment (Doc. No. 27) will be granted on Dunnam's Tennessee state law claims and

denied in all other respects;[11] Wilson County's Motion to Amend/Correct Statement of Facts (Doc. No. 33), Dunnam's Motion to Amend/Correct Response (Doc. No. 58), and Dunnam's Motion for Leave to File Sur-Reply (Doc. No. 64) will be granted; and Jakalski's Motion for Summary Judgment (Doc. No. 23) will be denied.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

_____

[11] Dunnam has filed a motion for sanctions based on Defendants' purported spoliation of evidence that has been referred to the Magistrate Judge for preparation of a report and recommendation. (See Doc. Nos. 20, 21, 42). Because the subject of Dunnam's spoliation motion pertains to the alleged destruction of "an entire book of timesheets," evidence that does not relate to the reasons the Court grants summary judgment in Wilson County's favor here, it need not wait for the Magistrate Judge's report and recommendation on that matter prior to issuing the instant ruling. (Doc. No. 21-1 at 1).